791 F.2d 931
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
VIRGINIA T. BROWNING, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 85-5477
 United States Court of Appeals, Sixth Circuit.
 4/8/86
 
 REMANDED
 E.D.Ky.
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY
 Before: MERRITT and WELLFORD, Circuit Judges; and PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff, Virginia Browning, brought this action pursuant to section 205(g) of the Social Security Act, as amended 42 U.S.C. Sec. 405(g), to obtain judicial review of a denial of her claim for disability insurance benefits under Title II of the Social Security Act. Plaintiff filed an application for disability insurance benefits on December 30, 1982. She timely pursued and exhausted her administrative remedies before filing suit in the district court. Upon referral, the magistrate found that substantial evidence supported the ALJ's denial of benefits. The district judge conducted his own review and agreed. For the reasons that follow, we remand for further consideration.
 
 I.
 
 2
 The plaintiff alleges disability since December 2, 1980, arising from a back condition and a hiatus hernia. She met and continues to meet earnings requirements through the date of the adverse district court decision.
 
 
 3
 The plaintiff's testimony indicates that she is forty-nine years of age, has a fifth grade education, and has worked previously as an inspector and packer for the Bluegrass Industries. As a packer, she stood most of the day and was responsible for packing first aid kits and lifting boxes of kits weighing up to fifty pounds. Prior to this work, Browning worked as an inspector for the same company where she was also required to stand throughout an eight-hour work day and to lift heavy cartons. She also did quite a bit of twisting and turning in the course of her work. At a previous job with a seatbelt manufacturing concern, she worked primarily seated, but she had to lift items sometimes weighing from fifty to seventy pounds.
 
 
 4
 The plaintiff alleges that she is unable to engage in any substantial gainful activity because of back pain that started in 1980 in the lower portion of her back. She indicated that this pain started initially as a result of a kidney infection. She asserts that she has the pain all of the time and that her most comfortable position is lying flat. She indicates further that she has bowel control problems, particularly since the summer of 1982. She also claims to suffer headaches and blackout spells if she moves quickly or turns her head quickly.[1] She claims to experience black out episodes every other day, which she asserts sometimes come without warning. Finally, plaintiff complains of nervousness with crying spells, fearfulness, poor memory, and shaking under pressure.
 
 
 5
 Plaintiff takes care of some housekeeping responsibilities, and visits with friends regularly. She indicates that she can lift up to five pounds, sews, and at the hearing she indicated that she does not have any difficulty concentrating.
 
 
 6
 The medical evidence of record discloses that the plaintiff has complained of low back pain since at least October 20, 1980. At that time she was seen by G J. Sweeney, Jr., M.D., and on examination did not appear to be in acute distress.[2] Her spine was fairly supple with tenderness over the lumbosacral area. Straight leg raising was negative and the deep tendon reflexes were intact. She was put on an exercise program in order to lose weight.
 
 
 7
 The plaintiff was examined on behalf of the Commonwealth of Kentucky Division of Disability Determination by E. Ray, M.D., who indicated that as of January 10, 1983, plaintiff's diagnosis was urethrotrigonitis. A review of her history disclosed that the plaintiff had complained in the past of bilateral lower quadrant discomfort and a backache. A cystoscopy revealed that her urethra was extremely red and engorged with large inflammatory polyps anteriorly toward the vesical neck. She was treated symptomatically.
 
 
 8
 A report from Dr. Sweeney, however, discloses that the plaintiff had improved regarding her complaints of low back pain. He released her to work with no lifting of amounts weighing over ten pounds or bending at the waist repetitively. Dr. Sweeney again saw plaintiff on February 4, 1981, after she returned to work with restrictions on her ability to lift and bend. Dr. Sweeney's reexamination of February 4, 1981, showed only subjective symptoms--unaccompanied by hard neurological findings--of nagging low back pain without radiation into either lower extremity. She seemed to him 'quite honest' in her desire to return to work.
 
 
 9
 Previously plaintiff had been an outpatient at the University Hospital, Lexington, Kentucky, from April 27 through August 4, 1981, complaining primarily of chronic headaches associated with nausea and scatoma. These symptoms were felt to be suggestive of migraine headaches. Thereafter, in 1982, Dr. Nathan Moore treated plaintiff who presented a long history of nausea following meals. She was suspected of having reflux esophagitis. An x-ray showed a small hiatal hernia with definite gastro-esophageal reflux. The plaintiff was also treated symptomatically for acute bronchitis.
 
 
 10
 A consultative evaluation of Browning was performed on behalf of the Kentucky Bureau of Disability Determinations by E. W. Chick, M.D., on January 31, 1983. Examination of the extremities showed that straight leg raising was positive at forty-nine degrees on the left and thirty-seven degrees on the right. Knee flexion was possible to one-hundred thirty-five degrees bilaterally. Tremors and shaking were noted in the legs, arms, and hands on extended or prolonged movements. X-rays of the lumbosacral spine showed mild scoliosis of the lower dorsal and lumbar spine. The disc spaces were well preserved and there was a suggestion of minimal anterior wedging and possible compression deformity of the inferior aspect of the body of L1. It was Dr. Chick's impression that the plaintiff had a history of bowel frequency and occasional incontinence, history of frequent urinary tract infections, prior history of a hiatal hernia, low back symdrome with sciatica, history of a head injury, frequent headaches, and 'passing out' episodes. He suggested that the plaintiff undergo a neurological evaluation to determine the etiology of her headaches and 'passing out' spells.
 
 
 11
 At the suggestion of her attorney, plaintiff was examined on a psychological basis on June 9 and 20, 1983, by Wesley H. Sylvia, Ph.D., a clinical psychologist. The intelligence test disclosed that plaintiff had a full scale IQ of eighty and verbal IQ of only seventy-four. She tested at the 4.5 grade for reading. The psychologist felt that one test was suggestive of a conversion disorder. During the clinical interview plaintiff exhibited frequent crying spells interpreted as indicating major depression. She complained to Dr. Sylvia of insomnia, chronic fatigue, self-depreciation, feelings of worthlessness, decreased effectiveness or productivity at home, and of social withdrawal. The plaintiff's behavior indicated poor coping skills. She cried frequently and had a great deal of difficulty paying attention to various testing tasks. The psychologist diagnosed the plaintiff as having recurrent major depression with mood incongruent psychotic features. On the basis of his examination, he concluded that plaintiff's ability to relate to others was severely impaired as was her ability to maintain interests. He felt that the plaintiff's condition was incapacitating.
 
 
 12
 Subsequent to the hearing, however, plaintiff was examined by Carl Wiesel, M.D., a psychiatrist on behalf of the Secretary.[3] His examination disclosed that the plaintiff appeared to be a friendly individual who was at ease. Her speech was coherent and relevant and goal directed. She was not objectively depressed and was able to laugh appropriately. She did, however, have subjective feelings of depression in the form of feeling lonely and having crying spells. On cognitive testing, she was oriented in all spheres. He noted that he had reviewed the results of the psychological evaluation performed on July 13, 1983, by Dr. Sylvia and indicated that he disagreed with his conclusions, finding no evidence to confirm the diagnosis of major depressive disorder with mood incongruent psychotic features.[4] He noted that his clinical interview did not reflect a psychotic disorder. In his opinion, plaintiff could understand and follow simple instructions and relate appropriately to coworkers and follow supervisory instruction. She had only a moderate psychiatric impairment, diagnosed as a dysthymic disorder. Dr. Wiesel noted that, in spite of her borderline intelligence, petitioner was able to comprehend simple instructions and had an excellent memory.
 
 II.
 
 13
 This court's scope of review is limited to a determination of whether the Secretary's findings are supported by substantial evidence. Futernick v. Richardson, 484 F.2d 647 (6th Cir. 1973). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971).
 
 As this court recently stated:
 
 14
 The Social Security Administration has promulgated 20 C.F.R. Sec. 416.920, which establishes a sequential process for evaluating a disability claim. Under this five-step sequential evaluation process, the Secretary initially determines whether a claimant currently engages in substantial gainful activity. If so, the claimant does not qualify as disabled. Second, the Secretary examines the severity of the claimant's impairment. If the claimant does not have a severe impairment which significantly limits the claimant's ability to do basic work activities, the claimant cannot qualify as disabled. Third, the Secretary compares the claimant's impairment to the 'Listing of Impairments' in 20 C.F.R. Sec. 404, Subpart P. Appendix 1. The Secretary will find the claimant disabled if Appendix 1 lists the claimant's impairment or the claimant's impairment qualifies as the medical equivalent of a listed impairment. Fourth, if the claimant's impairment does not meet or equal a listed impairment, the Secretary next determines whether the claimant can perform the claimant's past work. If so, the claimant does not qualify as disabled. Finally, if the claimant cannot perform past work, the Secretary considers the claimant's residual functional capacity and the transferability of any skills the claimant may possess to determine whether the claimant qualifies as disabled.
 
 
 15
 Salmi v. Secretary of Health and Human Services, 774 F.2d 685, 687-88 (6th Cir. 1985) (footnotes omitted).
 
 III.
 
 16
 Plaintiff challenges the ALJ's finding that her impairments do not significantly limit her ability to perform basic work related activities. She argues that in determining that she could perform basic work the ALJ failed to consider her impairments in combination: (1) back pain that inhibits her ability to move, (2) chronic colon discomfort;[5] (3) a major depressive disorder.
 
 
 17
 We believe that the ALJ has substantial evidence to support his conclusions as to each of the claimed disabling conditions taken individually and considered independently. The evidence relating plaintiff's alleged depressive disorder, however, strongly conflicts. The psychologist, Dr. Sylvia, concluded plaintiff had such a disorder, while the psychiatrist, Dr. Wiesel, Flatly disagreed with this diagnosis. The ALJ found Dr. Sylvia's conclusions inconsistent with plaintiff's functioning in her daily activities. He noted that the record revealed no significant psychological disorder prior to Dr. Sylvia's diagnosis and concluded plaintiff's lifestyle belied a severe psychological disorder. He therefore ordered a psychiatric evaluation which disagreed with Dr. Sylvia's conclusions.
 
 
 18
 Plaintiff argues the ALJ gave undue weight to Dr. Wiesel's findings and protests the filing of his report after the ALJ had closed the record. While plaintiff does not rebut with any legal authorities the Secretary's discretion to weigh conflicting medical evidence, she maintains that there was a failure to consider all her problems and impairments, physical as well as mental.
 
 
 19
 Even if plaintiff, as found by the ALJ, has no single impairment 'which significantly limits her physical or mental ability to do basic work activity,' we feel that a remand to the Secretary is appropriate to consider the claimed impairments in combination to determine whether the combined effect may significantly preclude her work capability. We consider this appropriate also in light of plaintiff's limited IQ. Plaintiff's attorney will then have an opportunity to address this aspect of the case in light of Dr. Wiesel's report submitted after the hearing.
 
 
 20
 We remand this case for the limited purpose indicated.
 
 
 
 [1]
 She was in an accident at the age of three that required the insertion of a plate in her head
 
 
 [2]
 While plaintiff takes exception to this finding, the record appears to support the finding of the ALJ. See J/A at 128
 
 
 [3]
 Plaintiff argues that the ALJ improperly considered Dr. Wiesel's conclusions because his examination occurred after the hearing. Plaintiff claims she did not have an opportunity to cross-examine Dr. Wiesel. Plaintiff also claims that Dr. Wiesel's conclusions are suspect because his qualifications are not part of the record
 
 
 [4]
 These findings were based primarily on the Minnesota Multiphasic Inventory performed by Dr. Sylvia
 
 
 [5]
 She points to no medical evidence, however, to support her contention that her alleged incontinence qualifies her as disabled. The ALJ did acknowledge plaintiff has a small hiatal hernia, but plaintiff does not claim this is disabling
 Plaintiff also complained of headaches and swollen legs, but points to no medical evidence to support her allegations.